| | | |
|---|---|---|
| RUBEN SANCHEZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 06347 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, LOUIS GARCIA, | ) | |
| TOM DART, Cook County Sheriff in his | ) | |
| official capacity, and TYRONE FELIX, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Ruben Sanchez brought this civil-rights action against Chicago Police Officer Louis Garcia for false arrest and excessive force, and against Cook County Sheriff's Correctional Officer Tyrone Felix for excessive force.[1] After a three-day trial, the Court accepted the jury's unanimous verdict in favor of Officer Garcia on both the false arrest and excessive force claims, and declared a mistrial on the excessive force claim against Officer Felix after the jury deadlocked on that claim. R. 245, 08/07/15 Minute Entry.[2] Sanchez now moves for a new trial on his two claims against Officer Garcia under Federal Rule of Civil Procedure 59(a). R. 271, New Trial Mot. For the reasons discussed below, the motion is denied.

---

[1]Because this action was brought under 42 U.S.C. § 1983, this Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331.

[2]Citations to the record are "R." followed by the docket entry number. Citations to the trial transcript are [Month/Day AM or PM] Tr. at [Page:Line]. Sanchez only ordered the trial transcript from the jury selection portion of trial. (This is understandable as Sanchez is an indigent litigant.) So, the non-jury selection arguments raised in his motion for a new trial are not supported by citations to trial transcripts.

# I. Background

The jury found in favor of Officer Garcia, so the evidence as to the case against Garcia must be viewed in his favor. Late at night on August 10, 2010, Ruben Sanchez picked up a six-pack of beer at a store and began driving home. Chicago Police Officers Louis Garcia and William Murphy, who were patrolling the neighborhood, saw Sanchez drive through numerous stop signs and swerve across the center divider line. The officers signaled for Sanchez to pull over. Sanchez was nearly home at this point, however, so he decided to keep driving for a few blocks before pulling over by his parked trailer.

As Officer Garcia approached Sanchez, Sanchez stumbled out of his car. The officer could see that Sanchez's eyes were bloodshot and could smell alcohol on him. Garcia then directed Sanchez to get on the ground, which Sanchez refused to do. (Sanchez underwent stomach surgery a few years earlier, which according to Sanchez, prevented him from lying on the ground.) Instead, Sanchez clenched his fists and took a swing at the officer. Garcia forced Sanchez to the ground. With the help of other officers now on the scene, Garcia handcuffed him. At the time, Sanchez had an open can of beer in his car and marijuana in his pocket.

The officers drove Sanchez to the police station and placed him in an interview room. Chicago Police Officer Karen Etti found Sanchez lying on the interview room floor as she approached him to administer breathalyzer and field sobriety tests. Sanchez refused to take the tests. Officer Etti noticed that Sanchez had bloodshot eyes, slurred speech, and smelled of alcohol. Though Sanchez said

that he did not need medical attention, Etti arranged for him to go to the hospital anyway. Sanchez refused any medical treatment at the hospital.

Sanchez was charged with aggravated driving under the influence of alcohol (at the time of the stop, Sanchez's driver's license was suspended for a similar prior offense), possession of cannabis, aggravated assault of a peace officer, and resisting/obstructing a peace officer. The Cook County State's Attorney ultimately prosecuted Sanchez for aggravated driving under the influence and dropped the other charges.

While awaiting trial on the D.U.I. charge at Cook County jail, Sanchez had a run-in with Cook County Correctional Officer Tyrone Felix. When Sanchez tried to leave the dormitory to go to lunch on August 28, 2010, Officer Felix told Sanchez that he could not go. The officer also blocked the door so that Sanchez could not leave. For his part, Felix claims that Sanchez had earlier decided to skip lunch so was not part of the lunch count (which was necessary for movement of detainees from the dormitory to the lunch building). Felix testified that Sanchez (because he was not part of the lunch count) needed permission from a supervisor to go to lunch, which is why Felix could not let Sanchez leave the dormitory. Despite Felix's warning, Sanchez tried to go to lunch anyway, at which point (Sanchez claims), Felix threw him to the ground. Felix, by contrast, maintains that he never used any physical force against Sanchez that day.

At Sanchez's criminal trial for aggravated driving under the influence, Sanchez chose not to testify or call any witnesses. The jury found him guilty, and

the state court sentenced Sanchez to 18 months' imprisonment. Sanchez directly appealed his conviction, which the appellate court affirmed. The Illinois Supreme Court later denied Sanchez's petition for leave to appeal. Sanchez also instituted post-conviction proceedings challenging his conviction, but that petition was denied by the trial court and again affirmed by the appellate court. The Illinois Supreme Court also denied the petition for leave to appeal at this post-conviction stage.

Sanchez brought this § 1983 action in 2012, alleging that Officer Garcia unlawfully arrested him and used excessive force to effectuate the arrest, and that, at the Cook County Jail, Officer Felix used excessive force when he refused to let Sanchez go to lunch. R. 1, Compl.; R. 69, Third Am. Compl. Following a three-day trial and jury deliberations, the jury returned a verdict in favor of Garcia on both the false arrest and excessive force claims, but deadlocked as to the excessive force claim against Felix. 08/07/15 Minute Entry. The Court entered judgment in favor of Garcia and declared a mistrial on the claim against Felix. *Id.*

After the trial, Sanchez settled his claim against Felix, R. 267, 11/10/15 Minute Entry, but now moves for a new trial on his two claims against Garcia, R. 257, New Trial Mot. Sanchez asserts seven arguments in support of his motion, arguing that the Court erred by: (1) dismissing one juror for cause and not dismissing another juror for cause; (2) denying three of Sanchez's motions in limine and granting, in full or in part, five of the Defendants' motions in limine; (3) refusing to allow Sanchez's arrest report into evidence; (4) rejecting Sanchez's jury instructions on issue preclusion and false arrest; and (5) accepting the jury's partial

verdict. *Id.* Sanchez also asserts that (6) cumulative prejudicial error deprived him of a fair trial; and (7) the jury's verdict was contrary to the clear weight of the evidence. *Id.*

## II. Standard of Review

Sanchez moves for a new trial under Rule 59, which can only be granted "if the jury's 'verdict is against the manifest weight of the evidence, ... or if for other reasons the trial was not fair to the moving party.'" *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (quoting *Marcus & Millichap Inv. Servs. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011)). "In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cnty., Ill.*, 650 F.3d 631, 633 (7th Cir. 2011). But even with the trial court's authority to assess credibility, the new-trial standard is tough to satisfy, because generally "the district court is bound to the same evidence the jury considered, and can strike a piece of evidence from its weighing process only if reasonable persons could not believe it because it contradicts indisputable physical facts or laws." *Id.* at 633 (quotation omitted).

## III. Analysis

### A. Jury Selection: For Cause Challenges

Sanchez asserts that the Court erred when deciding whether to dismiss two potential jurors for cause. During jury selection, the Court dismissed Mr. Francisco Camacho in light of his limited English-speaking ability, and refused to dismiss Mr.

Kenneth Myers despite the fact that his ex-girlfriend's brother, a policeman, was killed 20 years ago while on duty. Sanchez contends that these decisions prejudiced him and warrant a new trial. New Trial Mot. at 2-5; R. 273, Pl.'s Reply Br. at 2-4. The Court addresses each for cause determination in turn.

### 1. Francisco Camacho

Mr. Camacho is a Mexican native who learned English as a second language by interacting with his coworkers. 08/03 AM Tr. at 107:8-108:4. During voir dire, he acknowledged that his English was "not very perfect," and that the language was "difficult to understand sometimes." *Id.* Sanchez maintains that the Court improperly dismissed Mr. Camacho due to his "strong accent and a lack of a high school or college education … ." New Trial Mot. at 3. Sanchez further contends—but without explanation—that the dismissal "prejudiced [him] and therefore necessitate[s] a new trial." *Id.* at 5.

Prospective jurors must be able to speak the English language in order to serve on a jury. 28 U.S.C. § 1865(b)(3). Without that ability, a juror cannot "comprehend the issues presented at trial, assess the evidence, and come to an independent judgment." *United States v. Pineda*, 743 F.3d 213, 217 (7th Cir. 2014). It is within the trial judge's sound discretion to dismiss any juror whom the judge is convinced lacks English language proficiency. *Id.* ("It is within the trial judge's sound discretion to remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired." (internal quotations and citation omitted)). And that dismissal will be upheld on appeal "unless *no legitimate*

*basis* for the court's decision can be found in the record, and the [party challenging the dismissal] shows that the juror's dismissal prejudiced his case." *Id.* (emphasis in original) (citing *United States v. Vega*, 72 F.3d 507, 512 (7th Cir. 1995)).

In *United States v. Pineda*, the Seventh Circuit affirmed the trial court's decision to remove a juror who "did not possess the requisite English language proficiency to serve as a juror without an interpreter." 743 F.3d at 217. The Seventh Circuit observed that the juror could not "understand trial proceedings without the assistance of an interpreter," and that the juror "had great difficulty understanding and communicating with the other jurors." *Id.* at 218. Concluding that the juror "was unable to perform his duties," *Pineda* held that the trial court did not abuse its discretion by removing him from the jury panel. *Id.* at 219; *United States v. Paulk*, 372 F. App'x 971, 973 (11th Cir. 2010) (affirming district court's dismissal for cause in light of juror's English comprehension and reasoning that "[b]y dismissing him, the district court was ensuring that every member of the jury would be able to understand the testimony and argument presented at trial and meaningfully participate in jury deliberations."); *United States v. Speer*, 30 F.3d 605, 611 (5th Cir. 1994) (finding no abuse of discretion where "the [trial] judge excused Corley because he believed that the other jurors would not be able to communicate with her and that she 'probably would detract from [the jury process] by causing difficulty in the deliberations.'").

In this case, the Court determined that, unfortunately, Mr. Camacho's English comprehension posed too great a risk of impairing jury deliberations.

Indeed, the Court's difficulty in understanding him was so substantial that the Court on its own raised the issue during a sidebar with the parties. 08/03 AM Tr. at 104:13-105:2. To be sure, during the sidebar, the Court acknowledged that Mr. Camacho "underst[ood] English well," *id.*, and the Court also voiced concern that "often those who have English as a second language are mistakenly stricken from juries … I do think they actually understand more than people comprehend just based on their accents," *id.* at 105:18-106:18. But nevertheless, the Court observed that Mr. Camacho had a "thick" accent, and that the Court "missed every fifth word … [and] had to … rely heavily on the realtime draft transcript"[3] when Mr. Camacho initially introduced himself. *Id.* Based on this, the Court concluded that "[Mr. Camacho's] ability to speak [English] may be … something that would impair deliberations." *Id.* at 104:21-105:2.

To make sure that excusing Mr. Camacho was the right decision, the Court asked Mr. Camacho additional follow-up questions about his English language proficiency:

| The Court: | And do you have some concerns about whether you can understand the evidence or talk to other jurors? |
|---|---|
| [Mr. Camacho]: | Well, I – I know the English not very perfect, right? I don't go too much to school. Well, because I have to work. I have to work for my family. |
| The Court: | I'm sorry. What did you say? |

---

[3]The realtime draft transcript is generated by the court reporter contemporaneously as the attorneys and witnesses (or, in this instance, potential jurors) speak in court. The court reporter has an advantage in understanding what is being said because she wears wireless earphones into which the potential juror's voice is directly piped through a microphone that the juror is holding (and the court reporter also is trained to record the spoken word).

| Mr. Camacho: | I said I don't go too much in school. So where I finished it was in Mexico. In here, I go, not too much. So it's what I know, how I know to speak the English is because I – with the workers. With the place I work, I've had to learn. And I know how to write a little bit, and I think that's all. But some – some work I – they are very – it's difficult to understand sometimes. Because the American language, the Spanish language is too different. |

08/03 AM Tr. at 107:1-108:4. The Court then heard from both parties before excluding Mr. Camacho on English-comprehension grounds:

| The Court: | [T]his is an appropriate for-cause challenge because I had to intensely concentrate when he was speaking to understand what he was saying. ... And I had to, not only intensely concentrate, but I was looking right at him. He's no more than six inches[4] away from me, looking at his lips, and it was still a struggle. So I'm afraid that I have serious concerns that he would not be able to communicate with his fellow jurors during deliberations. By the same token, the jury instructions, while not a complicated subject matter, I think the issue there is it's likely that he would take interpretations of the instructions from his fellow jurors as opposed to interpreting it in his own way. |

*Id.* at 111:8-112:3. These concerns, that Mr. Camacho would be unable to deliberate with his fellow jurors and interpret the jury instructions on his own, were legitimate grounds for the for-cause dismissal.[5] *See Pineda*, 743 F.3d at 217-19;

---

[4]At the sidebar, the Court stands right next to the potential juror.

[5]Sanchez identifies two other jurors whom the Court chose not to strike for cause despite that they "were not native speakers of English, had strong accents, and whom the Court also had difficulty understanding." New Trial Mot. at 3. But Sanchez fails to recognize that the Court only excluded Mr. Camacho after questioning him *extensively* about his English language proficiency. *See* 08/03 AM Tr. at 104:22-112:4. The Court acknowledged its difficulty understanding Mr. Camacho when he was a mere "six inches away," *id.* at 111:8-112:4, something that did not occur with the two other jurors whom Sanchez identifies. The Court also had to "look[] at [Mr. Camacho's] lips," *id.*, and rely on the "realtime draft transcript," *id.* at 105:18-106:18, in order to understand him. There is nothing in the record suggesting that the Court had to do the same in order to understand any other juror at trial.

*Paulk*, 372 F. App'x at 973; *Speer*, 30 F.3d at 611. It is true that Mr. Camacho did not require an interpreter to communicate with the Court, unlike the juror in *Pineda*. But that is not a requirement before finding that a potential juror must be dismissed for limited English-language ability. The in-court difficulty understanding Mr. Camacho unfortunately required his dismissal.

Even if somehow Mr. Camacho should not have been dismissed for cause, Sanchez would still have to show that Mr. Camacho's dismissal prejudiced his case. *See Pineda*, 743 F.3d at 217, 219 ("Whatever the basis for removing Vega, overturning the district court's decision … requires Pineda to show that the removal of the juror had a prejudicial effect on his trial."). This Sanchez has failed to do, and indeed has made no effort to make that showing. Absent any prejudice or harm arising from the dismissal, Sanchez is not entitled to a new trial.

### 2. Kenneth Myers

During voir dire, Mr. Myers reported that his ex-girlfriend's brother, a policeman, was shot and killed 20 years ago while on duty. 08/03 AM Tr. at 88:16-89:10. The incident occurred during a traffic stop in Lansing, Illinois. *Id.* Sanchez now asserts that the Court's "refus[al] to dismiss [Mr. Myers] for cause, requiring [Sanchez] to use a preemptory [sic] challenge," amounted to prejudicial error. New Trial Mot. at 4.

When scrutinizing the impartiality of a prospective juror, trial courts ask "whether the juror can put aside the experiences and beliefs that may prejudice his view of the case and render a verdict based on the evidence and the law." *United*

*States v. Taylor*, 777 F.3d 434, 441 (7th Cir. 2015); *United States v. Allen*, 605 F.3d 461, 464-65 (7th Cir. 2010). Dismissal is only appropriate where a prospective juror's voir dire responses "reveal a bias *so strongly* as to convince the judge that the juror cannot render impartial jury service … ." *Marshall v. City of Chi.*, 762 F.3d 573, 575 (7th Cir. 2014) (emphasis added); *id.* ("[T]he *voir dire* process aims to weed out jurors who hold personal biases so strong that their ability to act as a neutral arbiter is compromised."). The impartiality requirement is met where "a juror[] affirm[s] … that she can … lay aside her biases or her prejudicial personal experiences." *Id.* at 576. But courts must keep in mind that "[j]urors … cannot be expected invariably to express themselves carefully or even consistently." *Patton v. Yount*, 467 U.S. 1025, 1039 (1984). Trial courts are entitled to "great deference" when striking jurors based on bias. *United States v. Barnes*, 909 F.2d 1059, 1070-71 (7th Cir. 1990). This is because trial judges have "[an] unique opportunity to assess the credibility of the jurors during *voir dire* examination, as well as their demeanor throughout the course of trial." *Id.*

To see this legal principle in action, consider *United States v. Allen. Allen* was a prosecution on child pornography charges in which the defendant challenged the district court's failure to strike a prospective juror whose daughter was the victim of an attempted molestation and kidnapping. 605 F.3d at 464-66. The Seventh Circuit rejected the defendant's challenge for three reasons: First, "the unrelatedness of [the defendant's] case and of the kidnapping attempt suggest that any bias was minimal … ." *Id.* at 465. Second, the potential juror "stated finally" that she would

suspend judgment and give the defendant the benefit of the doubt until the close of evidence. *Id.* Third, "the trial judge was in the best position to gauge the prospective juror's ability to follow[ ] [his] instructions." *Id.* at 466 (internal quotations and citation omitted). The Seventh Circuit noted that "the trial judge's questioning of the prospective juror could have been more explicit," but nevertheless held that "the district court was within its discretion to find that the prospective juror[] … [could] decide the case fairly." *Id.* (internal quotations and citation omitted).

The same circumstances surrounding the prospective juror's alleged bias in *Allen* are present here. Mr. Myers disclosed that he had a friend who was shot and killed while on duty about 20 years ago in Lansing, Illinois. 08/03 AM Tr. at 88:16-89:10. The dissimilarities in context, time, and location between Mr. Myers's experience and Sanchez's case against Officers Garcia and Felix favor a finding that any potential bias would be minimal, at most. *See Allen*, 605 F.3d at 465.

And as in *Allen*, the Court here engaged in a thorough back-and-forth with Mr. Myers to ensure his impartiality. 08/03 AM Tr. at 89:18-93:7. Mr. Myers told the Court that he had worked in various capacities with law enforcement both as a firefighter and paramedic, and assured the Court that he had "seen a variety of both good and bad reactions."[6] *Id.* Mr. Myers also assured the Court that he would follow the Court's instructions and apply the law to the facts:

---

[6] Later during voir dire, Mr. Myers relayed a negative experience that he (or rather his wife) had with law enforcement: Mr. Myers disclosed that his wife had been arrested before for driving under the influence despite that "she was not impaired" and had "passed the sobriety test." 08/03 AM Tr. at 118:25-122:8. When asked whether there was anything about the experience that would prevent him from being fair, Mr. Myers reaffirmed his impartiality towards law enforcement, either way. *Id.* at 121:21-24.

The Court: Will you be able to follow an instruction that you will have to weigh the testimony of a law enforcement officer, and also paramedics, if they –

[Mr. Myers]: *Right, right.*

The Court: The same way. Treated on an individual-by-individual basis?

[Mr. Myers]: *Right.* I mean, well, I would hope that I would. But, I mean, I think – I don't know how to explain it. …

The Court: Right.

[Mr. Myers]: It's hard to answer that. But I would think that I would do my best to listen to the facts and give an honest opinion.

The Court: Yes.

[Mr. Myers]: *And that's what I've always done.*

The Court: Right. And I – you know, I will supply the law –

[Mr. Myers]: *Right.*

The Court: (Continuing) – you know, that has to be applied. So you know, you'll get a legal standard to apply.

[Mr. Myers]: Uh-huh.

The Court: And then what I – it's important that you be able to follow that legal standard, okay. Do you think, and it sounds like – you said you always try to give your honest opinion –

[Mr. Myers] *Right.*

The Court: All right. Will you be able to follow the legal instruction I give you?

[Mr. Myers]: *Yes.*

The Court: Okay. And then in terms of sorting out the facts, like who's telling the truth and who's not.

[Mr. Myers]: *Right.*

> The Court: All right. And can you judge that on an individual and case-by-case basis?
>
> [Mr. Myers]: I think so, *yeah*.

*Id.* (emphases added). To be sure, Mr. Myers did not always answer resolutely and unequivocally throughout this back-and-forth. *Id.* But he persistently confirmed that he would follow the Court's instructions, sort out the facts on an individual case-by-case basis, and apply the law to those facts. *Id.*; *see also Allen*, 605 F.3d at 466 ("Prior equivocating or wavering is hardly dispositive in assessing credibility, as '[j]urors … cannot be expected invariably to express themselves … consistently.'" (quoting *Patton*, 467 U.S. at 1039)). The Court's own in-court observations of Mr. Myers gave the Court confidence that he answered truthfully when he said that he would evaluate law enforcement testimony the same as any other testimony and that he could decide this case on an individual basis. On this record, there was no basis for the Court to excuse Mr. Myers for cause.

It is worth noting that Sanchez also has failed to show how the Court's refusal to dismiss Mr. Myers prejudiced his case. Although Sanchez protests that this refusal "requir[ed] [him] to use a preemptory [sic] challenge" in order to excuse Mr. Myers, he does not contend that the *impaneled jury* was biased in any way. New Trial Mot. at 4-5. Any error occasioned by the Court's refusal to strike Mr. Myers was therefore harmless. *See United States v. Polichemi*, 219 F.3d 698, 704-05 (7th Cir. 2000) (holding that district court's failure to excuse a juror does not call into question the impartiality of the jury ultimately selected); *Shabazz v. Hall*, 2015

WL 4561272, at *7 (N.D. Ill. July 29, 2015) (observing that "errors by the trial court [for failure to dismiss a juror for cause] are to be assessed by inquiring whether the jury that actually decided the case was qualified and impartial." (internal quotations and citations omitted)); *Warfield v. City of Chi.*, 679 F. Supp. 2d 876, 883 (N.D. Ill. 2010) (denying the defendants' post-trial motions after reasoning that "when a juror whose *voir dire* is challenged does not[] sit on the jury, the defendant is 'not deprived of any rule-based or constitutional right.'" (quoting *United States v. Brodnicki*, 516 F.3d 570, 575 (7th Cir. 2008)). Sanchez is not entitled to a new trial based on the for-cause decisions.

## B. Evidentiary Rulings

In the new trial motion, Sanchez contests nine evidentiary rulings made by the Court. A party seeking a new trial based on erroneous evidentiary rulings bears a "heavy burden." *Alverio v. Sam's Warehouse Club*, 253 F.3d 933, 942 (7th Cir. 2001). This is because "[t]he decision whether to admit evidence is a matter peculiarly within the competence of the trial court … ." *Manuel v. City of Chi.*, 335 F.3d 592, 595 (7th Cir. 2003). So, even if the trial court's decision was erroneous, "[a] new trial is warranted only if the error had a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009). A new trial is not warranted, however, if the erroneous decision was "harmless," that is, "if the record indicates the trial result would have been the same." *Id.*

# 1. Motion in Limine Decisions

Sanchez challenges the Court's decisions on eight of the parties' motions in limine. He asserts that the Court improperly denied the following three motions:

— Sanchez Motion in Limine No. 3: Marijuana

— Sanchez Motion in Limine No. 5: Underlying Criminal Case

— Sanchez Motion in Limine No. 6: Convictions and Arrests of Witnesses

He also asserts that the Court improperly granted, in full or in part, the following five motions:

— Garcia Motion in Limine No. 7: General Orders, Rules, and Policies

— Garcia Motion in Limine No. 10: Prior Misconduct

— Garcia Motion in Limine No. 16: IPRA Investigation

— Felix Motion in Limine No. 13: Indigency/Disability

— Felix Motion in Limine No. 17: Administrative Proceeding Disclaimer

In his motion for a new trial, Sanchez does not offer any argument whatsoever as to Garcia Motion in Limine No. 7; Garcia Motion in Limine No. 10; and Garcia Motion in Limine No. 16. So the Court incorporates the prior decisions on those motions by reference in this Opinion. *See* R. 188, Pre-PTC Order at 12-13; R. 192, PTC Order at 6. With that out of the way, the Court moves onto the other five motions. For these motions, Sanchez only offers one or two-line arguments challenging the prior decisions, *see* New Trial Mot. at 5-6; Pl.'s Reply Br. at 4-6, but the Court will address them again.

## a. Sanchez Motion in Limine No. 3: Marijuana

Before trial, Sanchez moved to exclude any evidence of the marijuana allegedly found in his possession on the night of his arrest. *See* R. 176-2, Sanchez Mot. in Limine No. 3. Sanchez maintains that the evidence was too prejudicial because "[he] was never charged or convicted of possession of marijuana." Pl.'s Reply at 5; New Trial Mot. at 5. He also asserts that even if recovering the marijuana was a partial defense against damages, "the Court could have limited such mention until the damages portion of the trial." Pl.'s Reply Br. at 5. Both of these arguments must be rejected.

As the Court explained in one of the orders issued before trial, the fact that Sanchez was *arrested* by Garcia for possession of marijuana, even if he was not later formally charged by a prosecutor, was relevant as a potential limit on the damages for the false-arrest claim:

> [T]he recovery of the marijuana … is relevant as a potential partial defense against damages for part of the time spent in custody. Specifically, even if the jury were to reject all of Garcia's purported reasons for stopping and arresting Sanchez in front of his home, if the jury concluded that the marijuana was indeed found on Sanchez once he was in custody, Sanchez's claim to damages would be limited to the period from the traffic stop and in-front-of-home arrest to until the marijuana was discovered (because it provides a valid reason for arrest and custody after that moment).

PTC Order at 2. The Court further reasoned that "[n]o amount of potential prejudice to Sanchez under Rule of Evidence 403 can overcome this relevancy," *id.*, especially given the changing societal views on marijuana possession for personal use. Despite denying Sanchez's motion in limine to exclude the marijuana, the Court invited Sanchez to propose a limiting jury instruction on the use of this evidence. *Id.* Sanchez never proposed one. Because the marijuana evidence was

relevant to the false arrest claim and not unfairly prejudicial to Sanchez, the initial decision to allow the evidence was correct.

Second, there was no way, as Sanchez proposes, to limit "mention[ing] [the marijuana] until the damages portion of the trial." Pl.'s Reply Br. at 5. Liability and damages were not tried separately. In fact, neither party ever asked for a bifurcated trial. Without a pretrial request to bifurcate, the argument is forfeited. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 609-10 (7th Cir. 2006) (holding that the defendants forfeited their objection to a witness's testimony by failing to raise it in either their motion in limine to exclude the witness's testimony or during the testimony itself); *see also FMS, Inc. v. Volvo Const. Equip. N. Am., Inc.*, 2007 WL 844899, at *7 (N.D. Ill. Mar. 20, 2007) ("Motions for a new trial are not designed to permit litigants to re-argue the case under new legal theories."); *Extreme Networks, Inc. v. Enterasys Networks, Inc.*, 2009 WL 679602, at *2 (W.D. Wis. Mar. 16, 2009) (denying the defendant's motion for a new trial based on the Court's exclusion of its expert after reasoning that "[t]o the extent defendant is raising new arguments to bolster its position, it has forfeited these by failing to present them before the in limine ruling."). The Court did not err in allowing evidence that officers found marijuana on Sanchez when he was arrested.

### b. Sanchez Motion in Limine No. 5: Underlying Criminal Case

In his Motion in Limine No. 5, Sanchez moved to exclude all evidence of his underlying criminal case. R. 176-4, Sanchez Mot. in Limine No. 5. Remember that Sanchez was convicted in the underlying Illinois state court case for aggravated

driving under the influence. Now, Sanchez makes two arguments challenging the extent to which the Court allowed evidence of his criminal conviction: first, Sanchez asserts that this evidence "prejudiced [him] in the jury's eyes." New Trial Mot. at 5. Second, he asserts that the Court should have allowed other details about his criminal case, including that "[he] … continu[ed] to contest the disposition of [the] underlying case," "he was not allowed to testify on his own behalf," and "discovery was not provided to him." Pl.'s Reply Br. at 5. The Court has already rejected Sanchez's first argument,[7] so it need only address the second one here.

The Court did not err when it refused to admit extraneous details about Sanchez's criminal case. Evidence of Sanchez's post-conviction challenge had little probative value—and really none at all—and would only serve to confuse the jury. By July 2015, the Illinois Appellate Court and Supreme Court had dismissed Sanchez's direct appeal and the Illinois Appellate Court had already denied his

---

[7]The Court analyzed the admissibility of Sanchez's underlying conviction in two pre-trial orders. In one pre-trial order, the Court denied Sanchez's motion in limine to exclude the underlying convictions after reasoning that "the D.U.I. conviction is relevant. As a matter of issue preclusion, Garcia will be able to use the conviction to establish that Sanchez was in fact driving under the influence of alcohol or drugs—a required element of the crime of which Sanchez was convicted." Pre-PTC Order at 3.  And in a later pre-trial order, the Court explained that the underlying conviction was admissible because "there was a final judgment in the prosecution and Sanchez cannot mount a collateral attack on the conviction in this lawsuit. … [T]he conviction is a final judgment that is entitled to preclusive effect about the issues that were necessary to the judgment." PTC Order at 2-3. That Sanchez was amidst a post-conviction proceeding at the time of the trial also did not affect the preclusive force of the conviction. *See* R. 227, 08/03/15 Minute Entry ("[The post-conviction proceeding] does not undermine the binding force of issue preclusion, there is a question, in Illinois law, whether an appeal renders preclusion inapplicable, *see Langone v. Schad, Diamond*, 943 N.E.2 673, 687 (Ill. App. Ct. 2010), but no case law suggests (and certainly none cited by Plaintiff) that a post-conviction petition renders a judgment non-final for issue preclusion purposes." (italics added)). So the conviction established, and thus had to be allowed into evidence, that Sanchez was under the influence on the night of his arrest.

post-conviction petition. *See People v. Sanchez*, 2013 IL App (1st) 110900-U (denying direct appeal), *appeal denied*, 2 N.E.3d 1049 (Ill. 2013); *People v. Sanchez*, 2 N.E.3d 1049 (Table) (Ill. 2013) (denying direct petition for leave to appeal to the Illinois Supreme Court); *People v. Sanchez*, 2015 IL App (1st) 130369-U (denying post-conviction appeal), *appeal denied*, 39 N.E.3d 1009 (Ill. 2015). So, by the time this trial was underway, Sanchez was only waiting on his post-conviction petition for leave to appeal to the Illinois Supreme Court; as it turns out, the petition was denied in September 2015. *See People v. Sanchez*, 39 N.E.3d 1009 (Ill. 2015) (denying post-conviction petition for leave to appeal to the Illinois Supreme Court). As the Court has already explained, the post-conviction proceeding "does not undermine the binding force of issue preclusion." 08/03/15 Minute Entry. And while "there is a question, in Illinois law, whether an *appeal* renders preclusion inapplicable, *see Langone v. Schad, Diamond*, 943 N.E.2 673, 687 (Ill. App. Ct. 2010), ... no case law suggests (and certainly none cited by Plaintiff) that a *post-conviction* petition renders a judgment non-final for issue preclusion purposes." *Id.* (emphases added). In addition to the irrelevance of the post-conviction petition, introducing it also would have required an explanation of what a post-conviction proceeding even is under Illinois law (as well as the intermediate appeal and the petition for leave to appeal that was pending). That Sanchez was unable to offer evidence of his post-conviction petition for leave to appeal to the Illinois Supreme Court does not necessitate a new trial.

In addition to complaining about the exclusion of the post-conviction petition, Sanchez also contends that he should have been allowed to tell the jury that he neither testified in his criminal prosecution nor received complete discovery in his criminal case. Again, the relevance of these facts is zero, because issue preclusion dictated that the driving-under-the-influence offense was established. What's more, going down these avenues would require an explanation of why Sanchez chose not to testify (and the defense could challenge his explanation), what the State's discovery obligations were (and the defense could challenge Sanchez's assertion that he did not get discovery). And, in any event, Sanchez actually did testify at the civil trial that he did not testify in the underlying criminal case. To the extent that other details about the prosecution were not allowed into evidence, there is no basis to grant a new trial.

### c. Sanchez Motion in Limine No. 6: Convictions and Arrests of Witnesses

At trial, Sanchez called two inmates from Cook County jail—Obie Warlick and Warren Holloway—to testify about his encounter with Officer Felix on August 28, 2010. Consistent with the Court's pre-trial orders, the defense was allowed to cross-examine both inmates about their most recent criminal felony convictions. Now, Sanchez contends that "the Court allowed … the witnesses' convictions to be admitted for impeachment purposes, which … prejudiced [him]." New Trial Mot. at 5. He maintains that under Rule of Evidence 609, "[the Court] should have performed a balancing test for each conviction that was admitted to see whether the probative value as to the witness's *credibility* was not substantially outweighed by

the danger of unfair prejudice or confusion in the jury's mind … ." Pl.'s Reply Br. at 5 (emphasis in original).

The problem with this argument is that the Court *in fact* performed in-depth balancing to determine which convictions, if any, would be admissible at trial. Before trial, the Court issued an order scrutinizing both Warlick's and Holloway's prior convictions. R. 218, 07/31/15 Order. In that order, the Court balanced the probative value and the prejudicial effect of those convictions under Rule of Evidence 609 to determine which convictions were admissible to impeach Warlick and Holloway. *Id.* at 1, 3-4. When scrutinizing Warlick's prior convictions, the Court observed that "[the defense] seeks to introduce eight of [Warlick's 29 prior convictions], mostly felony convictions for theft and burglary." *Id.* at 3. After weighing each conviction's probative value against its prejudicial effect, the Court determined that the defense could only question Warlick about his three most recent felony convictions:

> [A]llowing the defense to question [Warlick] on a litany of convictions would be cumulative, would tend to confuse the jury as to the proper purpose of this evidence, and would present a significant risk of unfair prejudice. Given Warlick's extensive criminal history, however, it is appropriate to allow the defense to impeach him using at least some subset of his felony convictions. Defendants will therefore be permitted to cross-examine Warlick on the following convictions:
>
> (1) 2014 conviction for felony retail theft;
> (2) 2012 conviction for possession of a controlled substance; and
> (3) 2008 conviction for attempted burglary.
>
> These felonies, which are the most recent, allow Defendants to impeach Warlick without the risk that the jury will give too much weight to prior convictions in its determination of credibility.

*Id.* The Court warned, however, that the defense could not "elicit testimony that the retail theft conviction was elevated to a felony because of prior retail theft convictions." *Id.*

Similarly, the Court conducted a detailed Rule 609 analysis of Holloway's prior convictions:

> [U]nder Rule 609, Defendants may cross-examine Holloway on his two most-recent felony convictions: a 2013 conviction for delivery of a controlled substance and a 2011 conviction for possession of a controlled substance. Allowing these two convictions will effectuate the Rule 609 theory of impeachment without presenting significant issues of cumulative testimony or undue prejudice.

07/31/15 Order at 3-4. As part of this analysis, the Court rejected the Defendants' request to cross-examine Holloway on a 2004 conviction despite that he pled guilty to the underlying crime under oath and now denied committing the crime. *Id.* at 3. The Court also warned that the defense could not "elicit any testimony about the factual circumstances that elevated [his 2013 conviction for delivery of a controlled substance] to aggravated delivery of a controlled substance. The additional aggravating factors have limited probative value and present a high risk of undue prejudice." *Id.* at 4.

As shown by those orders, the Court actually performed in-depth analyses on Warlick's and Holloway's prior convictions under Rule 609 and Rule 403. And part of the analyses did consider the cumulative effect of disclosing the witnesses' prior convictions to the jury. In addition to the Rule 609 balancing tests, the final jury instructions added yet another safeguard against unfair prejudice by limiting the

extent to which the jury considered evidence of Warlick's and Holloway's prior convictions:

> ### CREDIBILITY OF WITNESS — CONVICTIONS
>
> You have heard evidence that certain witnesses have been convicted of one or more crimes. There is a strict limit on what use you can make of that evidence. The *only* use is this: the law allows a jury to consider whether a witness is less believable if he has been convicted of a crime. But a jury is not required to accept the idea that evidence of a conviction has a negative impact on someone's believability. So you may—but need not—use that evidence only to help you decide whether to believe the witness and how much weight to give his testimony.

R. 239-1, Final Jury Instructions at 15. Notably, Sanchez could have asked the Court to give this limiting instruction during Warlick's and Holloway's cross-examination, as opposed to only at the close of evidence, but Sanchez never asked for that. The evidence of the witnesses' prior convictions does not warrant a new trial.

One final point: Warlick's and Holloway's testimony was irrelevant to Sanchez's case against Officer *Garcia*. Remember, Warlick and Holloway witnessed Sanchez's encounter with Officer Felix at Cook County jail. So *even if* the Court erred in allowing those witnesses' prior convictions, that error still would not have had "a substantial and injurious effect or influence on the … jury" vis-à-vis Sanchez's case against Officer Garcia. Sanchez's motion for a new trial based on this ground is denied.

### d. Felix Motion in Limine No. 13: Indigency/Disability

Sanchez asserts that he should have been able to refer to himself at trial as "disabled." New Trial Mot. at 5-6. Specifically, before trial, Sanchez sought to admit

the Social Security Administration's determination that Sanchez qualified for disability benefits. Keeping this evidence from the jury, Sanchez now argues, "prejudiced [him] as it suggested to the jury that his condition was likely only cosmetic, and that he was exaggerating his pain and limitations." New Trial Mot. at 5-6; *id.* ("By preventing [Sanchez] from even mentioning that he was disabled, the jury was not able to determine if his stomach injury, and resulting surgery with continuing pain was genuine.").

But, as the Court already stated in a pre-trial order, "the use of the term 'disabled' without any further detail or background is problematic." Pre-PTC Order at 8. This is in large part because the evidence establishing that Sanchez was disabled—the SSA determination—failed to pass muster under Rule of Evidence 403:

> [I]t is likely that the jury would put undue weight on this legal determination, because it was made by a government agency, even though for purposes of Sanchez's claims against the Defendants, it is not necessarily relevant … . Add to that the need to explain the legal background for an SSA disability finding, and very quickly the probative value is substantially outweighed by confusion and waste of time. Lastly, the disability finding might also improperly evoke the semblance of a medical diagnosis, leading to further confusion and unfair prejudice.

PTC Order at 5. And although Rule 403 prevented Sanchez from referring to himself as "disabled" at trial, the Court notes that he was able to physically show the scars on his stomach to the jury. The fact that the jury saw first-hand the extent of Sanchez's stomach condition negates any claim that excluding the SSA records unfairly prejudiced Sanchez. Preventing Sanchez from offering evidence of the SSA's disability determination does not warrant a new trial.

### e. Felix Motion in Limine No. 17: Administrative Proceeding Disclaimer

For the final challenge concerning a motion in limine, Sanchez targets the "administrative proceedings rights" disclaimer signed by Officer Garcia as part of an Independent Police Review Authority (IPRA) investigation. The disclaimer advised the officer that any statement he gave was involuntary, which in turn preserved the officer's Fifth Amendment right against self-incrimination. In his reply brief, Sanchez asserts that "[g]ranting Felix Motion *in Limine* No. 17 … unfairly truncated the exhibit intended for use, which effectively prevented [Sanchez] from using the IPRA investigation documentation for impeachment purposes." Pl.'s Reply Br. at 6.

Before trial, the Court held that the disclaimer was inadmissible because "'there is no evidence that [a] disclaimer [of this sort] affects the veracity of an officer's statement,'" Pre-PTC Order at 9 (quoting *Robinson v. City of Chi.*, 2013 3716651, at *1 (N.D. Ill. July 15, 2013)), and because the probative value of the disclaimer was substantially outweighed by the risk of unfair prejudice, confusion, and waste of time that evidence posed, *id. See also* PTC Order at 5. Despite this holding, the Court still invited Sanchez to "file additional arguments [challenging the admissibility of] Garcia's disclaimer" before the trial began, PTC Order at 5, which he never did.

Like Sanchez's other claims on the motion in limine decisions, this one fails too. To start, Sanchez did not raise this argument—that is, excluding the disclaimer prevented him from impeaching Officer Garcia—in either his response to Felix

Motion in Limine No. 17 or at trial. By waiting to raise this argument in his motion for a new trial, Sanchez has forfeited it. *See Naeem*, 444 F.3d at 609-10.

Forfeiture aside, Sanchez's argument still must be rejected. Sanchez does not identify which exhibit was "unfairly truncated" as a result of the decision to exclude the disclaimer. *See* Pl.'s Reply Br. at 6. Neither does he explain how the truncated exhibit "effectively prevented [him] from using the IPRA investigation documents for impeachment purposes." *Id.* And the Court declines to think up an explanation for him. In any event, the Court cannot see how impeaching Officer Garcia with the IPRA investigation documents hinged on the boilerplate disclaimer contained in those documents. Absent any reasoned explanation as to how excluding the disclaimer "had a substantial and injurious effect or influence on the determination of a jury," *Lewis*, 590 F.3d at 440, Sanchez is not entitled to a new trial based on Felix Motion in Limine No. 17.

### 2. Garcia Exhibit 12: Sanchez's Arrest Report

Garcia Exhibit 12 is the arrest report filled out by both Officer Garcia and the lockup keeper who visually evaluated Sanchez at the police station after Sanchez's arrest. At trial, Sanchez sought to introduce the exhibit to impeach Officer Garcia during his rebuttal case. Specifically, he sought to impeach Garcia with the portion of the arrest report completed by the *lockup keeper*, which contained the following observations:

— Is there obvious pain or injury?          Yes.

— Under the influence of alcohol/drugs?          No.

At trial, the Court decided that Garcia could not be impeached by the *lockup keeper*'s statement as if the statement were made by Garcia. The Court also decided that the portion of the arrest report written by the lockup keeper could not be allowed in as substantive evidence (as distinct from impeachment by inconsistent statement) via Garcia, because Garcia could not authenticate portions of the arrest report that he did not personally complete. Now Sanchez argues that the arrest report should have been admitted as a public record under Rule of Evidence 803(8)(A)(ii).[8] New Trial Mot. at 6-7; Pl.'s Reply Br. at 6-7.

But this argument conflates *authenticating* the arrest report with *allowing* the report under the public-records exception to the hearsay rule. A police report is only admissible as a public record under Rule of Evidence 803(8) if the sponsoring party establishes a proper foundation as to what the report purports to be. *See* Fed. R. Evid. 901(a) (party seeking to admit an item into evidence must "produce evidence sufficient to support a finding that the item is what the proponent claims it is."). To be sure, the part of the arrest report that Garcia filled out would surely be admissible. And even the lockup keeper's part of the report might have been admissible as a public record.[9] But that would have required Sanchez to properly

<hr>

[8] Rule 803(8)(A)(ii) states that a public record is not excluded by the hearsay rule if "it sets out … a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel … ." Fed. R. Evid. 803(8)(A)(ii).

[9] Officer Garcia maintains that the lockup keeper's portion of the arrest report was inadmissible hearsay: "If the police report is being offered for the truth of a portion which the officer did not have firsthand observation of, that portion is inadmissible under FRE 805 (hearsay within hearsay)." R. 272, Garcia Resp. Br. at 13. But the arrest report does not pose any hearsay-within-hearsay issue here. Officer Garcia is right that "[p]olice reports have generally been excluded except to the extent to which they incorporate

authenticate the report; that is, provide a sponsoring witness—a records custodian, for example—to testify that the arrest report "was recorded or filed in a public office as authorized by law," or "from the office where items [like arrest reports] are kept." Fed. R. Evid. 901(7); Fed. R. Evid. 901 advisory committee's note ("Public records are regularly authenticated by proof of custody … .").[10] This Sanchez did not do. Instead, Sanchez attempted to use Officer Garcia as the sponsoring witness to admit the *entire* report, but Officer Garcia could only lay the foundation for, and only testify to, the portion of the arrest report that he filled out. *Cf. United States v. Hatchett*, 245 F.3d 625, 644 (7th Cir. 2001) (affirming district court's refusal to admit a lab report under Rule 803(8) where the defendant failed to produce "a witness who could identify and authenticate the report."). Garcia would have been guessing as to the part filled out by the lockup keeper. Because Garcia was not a proper sponsoring witness for the section of the arrest report completed by the lockup keeper, Sanchez has failed to show that excluding the report was an error. Sanchez's motion for a new trial based on Garcia Exhibit 12 is denied.

---

*firsthand observations* of the officer," Fed. R. Evid. 803 advisory committee's note (emphasis added), but this just means that "the public-records exception does not attach to [statements made by] *third parties* who themselves have no public duty to report," *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013) (emphasis added). In fact, the Seventh Circuit has held that "Rule 803(8) is a multi-level exception." *Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1308 (7th Cir. 1992). In other words, a public record will not be excluded just because its author incorporated information furnished by others who also had a duty to report. *Id.*

[10]Had Sanchez obtained a certified copy of the arrest report, the report would have been self-authenticating under Rule of Evidence 902. *See* Fed. R. Evid. 902(1), 902(2).

## D. Jury Instructions

Sanchez challenges two jury instructions, one which instructed the jury on Sanchez's criminal conviction for driving under the influence (D.U.I. Instruction), *see* Final Jury Instructions at 16, and another which provided a definition of "probable cause" to arrest (False Arrest Instruction), *see id.* at 25-26. *See also* New Trial Mot. at 7-8; Pl.'s Reply Br. at 7-8. To evaluate the challenges, the Court bears in mind that jury instructions must "'represent[] a complete and correct statement of the law." *United States v. Noel*, 581 F.3d 490, 499 (7th Cir. 2009) (quoting *United States v. Matthews*, 505 F.3d 698, 704 (7th Cir. 2007)). A new trial will not be granted unless the party opposing the instructions "'show[s] both that the instructions did not adequately state the law and that the error was prejudicial to [him] because the jury was likely to be confused or mislead.'" *United States v. White*, 443 F.3d 582, 587 (7th Cir. 2006) (quoting *United States v. Smith*, 415 F.3d 682, 688 (7th Cir. 2005)); *see also Lasley v. Moss*, 500 F.3d 586, 589 (7th Cir. 2007) (reversal is justified "only if the instruction misguides the jury so much that a litigant is prejudiced" (internal quotations and citation omitted)). When analyzing whether instructions were prejudicial, the Court "'consider[s] the instructions as a whole, along with all of the evidence and arguments' to determine whether 'the jury was misinformed about the applicable law.'" *White*, 443 F.3d at 587-88 (quoting *Smith*, 415 F.3d at 688). "When a jury instruction is erroneous there must be a new trial *unless* the error is harmless." *Wis. Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1289 (7th Cir. 1986) (emphasis added).

# 1. D.U.I. Instruction

As discussed earlier in the Opinion, *see supra* Section III.B.1.b., in light of the dictates of issue preclusion, the Court gave the following jury instruction on Sanchez's conviction for driving under the influence:

DRIVING UNDER THE INFLUENCE

> You heard evidence that Plaintiff Sanchez was convicted of driving under the influence of alcohol as a result of his arrest on August 10, 2010. You must accept as conclusively proven that Mr. Sanchez did drive under the influence of alcohol on that date.

Final Jury Instructions at 16. Sanchez contends that this instruction "omits mention of [Sanchez's] post-conviction petition that challenges his driving under the influence conviction and tends to endorse Garcia's credibility by stressing that the proof was 'conclusive.'"[11] New Trial Mot. at 7. He maintains that failing to tell the jury that "there was a possibility of reversal" constituted prejudicial error. *Id.* at 8.

Contrary to Sanchez's contentions, the D.U.I. Instruction adequately stated the law. This is because the D.U.I. Instruction "was tailored to be consistent with the criminal … judgment … ." *Viramontes v. City of Chi.*, 2015 WL 4637958, at *11 (N.D. Ill. Aug. 4, 2015); *id.* ("The Court's echoing of the criminal judge's judgment was therefore the appropriate way to inform the jury on the underlying facts of the

---

[11]Sanchez proposed the following jury instruction instead:

> For your deliberations in this matter, you are instructed that for purposes of this case, you must accept that Mr. Sanchez was convicted of driving under the influence of alcohol stemming from his arrest on August 10, 2010, even though he has a post-conviction petition pending that challenges that conviction.

*See* 08/03/15 Minute Entry (quoting Sanchez's proposed driving under the influence instruction, which was emailed to the Court's Proposed Order email account).

incident … ."). And, as previously explained, Sanchez's pending post-conviction petition for leave to appeal before the Illinois Supreme Court did not change the issue-preclusion effect of the conviction. *See supra* Section III.B.1.b. at 19 (explaining that by July 2015, the Illinois Appellate Court and Supreme Court had dismissed Sanchez's direct appeal and the Illinois Appellate Court had denied his post-conviction petition). As the Court has already explained, the post-conviction reference was a "gratuitous[]" detail.[12] 08/03/15 Minute Entry. Given that Sanchez's post-conviction proceeding had no effect on the binding force of his criminal conviction, Sanchez has failed to establish that the D.U.I. Instruction was inaccurate or unfairly prejudicial.[13]

In any event, even if the D.U.I. Instruction should have mentioned the petition for leave to appeal in the post-conviction proceeding, any error was harmless. Just a month after the trial in this case, the Illinois Supreme Court denied Sanchez's post-conviction petition for leave to appeal. *See People v. Sanchez*, 39 N.E.3d 1009 (denying post-conviction petition for leave to appeal to the Illinois Supreme Court). So, even if there was a slim possibility during the trial that

---

[12]This is particularly so because Sanchez appealed his conviction and sentence for *aggravated* driving under the influence. (The aggravated form of D.U.I. triggered because Sanchez committed the D.U.I. while his license was suspended after a prior similar offense.) More specifically, as reported by his lawyer at the pretrial conference, Sanchez was contesting that "[the] *aggravation was improperly applied*." PTC Order at 2 (emphasis added). So, telling the jury about the pending post-conviction proceeding would have only confused the jury by injecting an irrelevant detail about the underlying conviction.

[13]Rule of Evidence 609(e) does not help Sanchez here either. Rule 609(e) allows a court to admit evidence that a witness is appealing an otherwise admissible prior conviction. Fed. R. Evid. 609(e). The rule has nothing to do with whether a court must apprise the jury of a pending post-conviction petition where the underlying conviction is otherwise admissible for issue preclusion purposes.

Sanchez's D.U.I. conviction would be overturned, that was no longer the case by September 2015. Sanchez's motion for a new trial based on the D.U.I. Instruction is denied.

## 2. False Arrest Instruction

On the false arrest claim, the False Arrest Instruction identified the crimes that could serve as a valid basis for Sanchez's arrest: failure to stop at a stop sign; failure to keep vehicle in lane; driving under the influence of alcohol; transportation or possession of alcoholic liquor in a motor vehicle; aggravated assault; resisting or obstructing an officer; and possession of cannabis. Final Jury Instructions at 25. The False Arrest Instruction also defined each of those crimes for the jury. *Id.* at 25-26. According to Sanchez, "[i]t was error to add these crimes because [Sanchez] was only charged with [driving under the influence] … ." New Trial Mot. at 8. He also claims that the definitions of the crimes "were incomplete and unwarranted in light of the [D.U.I. Instruction]." *Id.*

Not so. Sanchez submitted to the jury that Officer Garcia did not have probable cause to arrest him for any offense. This submission in turn opened the door for Officer Garcia to establish that he had probable cause to arrest Sanchez for *any* crime. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) ("The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest … ."). The ultimate decision to only charge Sanchez for driving under the influence does not limit the grounds that the defense can rely on for the arrest. *See Jackson v. Parker*, 627 F.3d 634, 639 (7th Cir. 2010)

("Because of the objective nature of the probable cause analysis, it did not matter that the officer's subjective reason for making the arrest was driving under the influence rather than a violation of the parking offense."). This is because "[d]etermining whether an officer had probable cause to arrest [is] a purely objective inquiry." *Abbott*, 705 F.3d at 714. At the jury instruction conference, the Court ensured that there were sufficient facts from which the jury could infer there was objective probable cause to arrest Sanchez for any one of the six offenses listed in the False Arrest Instruction. It was neither inaccurate nor fundamentally unfair to identify and define those offenses despite that Sanchez was only charged with driving under the influence.

The Court hastens to add that Sanchez could have proposed his own definitions for each of the six offenses listed in the False Arrest Instruction, yet chose not to. At the jury instruction conference, Sanchez's counsel did not object whatsoever to several of the offenses that ultimately ended up in the False Arrest Instruction. And for the offenses that Sanchez's counsel did object to, the Court encouraged him to put something on file that night, which he never did. Absent any showing that the False Arrest Instruction was an incomplete or incorrect statement of the law, Sanchez's motion for a new trial based on that instruction is denied.

### E. Partial Verdict

During deliberations, the Court received two notes from the jury, one which stated that the jury had already reached a verdict on the claims against Officer Garcia, and another which stated that the jury was at an impasse as to the claim

against Officer Felix. The jury informed the Court that it had made no progress on Sanchez's excessive force claim against Felix for nearly 24 hours. After conferring with both parties and over Sanchez's objection, the Court accepted the partial verdict entered in favor of Garcia on the false arrest and excessive force claims against him, and declared a mistrial as to the excessive force claim against Felix. 08/07/15 Minute Entry. The Court concluded that a partial verdict was appropriate because there was no risk of inconsistent verdicts. The Court also referred the parties to an order that the Court had issued in another case on the propriety of accepting partial verdicts in civil cases. *See Hadnott et al. v. Kelly et al.*, No. 07 C 06754, Dkt. 411 (N.D. Ill. Feb. 15, 2014).

In his motion for a new trial, Sanchez once again objects to the taking of the partial verdict. He maintains that "[b]ecause the two claims were tried together, the claims should be adjudicated together as well and it does not make sense to separate [the two verdicts]." New Trial Mot. at 8-9; Pl.'s Reply Br. at 8. Although he acknowledges *Hadnott*'s holding—that is, courts as a matter of law can accept a partial verdict in civil cases—Sanchez emphasizes that "there is no mandatory authority for accepting a partial verdict." New Trial Mot. at 8. But Sanchez does not offer any substantive argument for why partial verdicts are not acceptable in civil cases.

Sanchez is right on one point: the Seventh Circuit has not addressed whether it is permissible for a district court to accept a partial verdict in a civil case. But district courts in this jurisdiction and others have accepted partial verdicts in civil

cases. *See Brown v. Doody*, No. 08 C 5711, Dkt. Nos. 174, 177 (N.D. Ill. Dec. 3, 2010); *Rosales v. Career Sys. Dev. Corp.*, 2010 WL 4220503, at *1 (E.D. Cal. Oct. 20, 2010); *Bostron v. Apfel*, 104 F. Supp. 2d 548, 549-50 (D. Md. 2000); *Herndon v. WM. A. Straub, Inc.*, 17 F. Supp. 2d 1056, 1058 (E.D. Mo. 1998); *Kane v. Oak Trust & Sav. Bank*, 1996 WL 616557, at *1 (N.D. Ill. Oct. 21, 1996). And at least three circuit courts of appeals have held that entering a partial verdict is acceptable in civil proceedings. *See Kernan v. City of N.Y.*, 261 F.3d 229, 243 n.9 (2d Cir. 2001); *Bridges v. Chemrex Specialty Coatings, Inc.*, 704 F.2d 175, 180-81 (5th Cir. 1983); *Robertson Oil Co. v. Phillips Petroleum Co.*, 871 F.2d 1368, 1369, 1375 n.5 (8th Cir. 1989) (citing *Bridges*, 704 F.2d at 180). By contrast, Sanchez fails to cite any authority stating that a district court may *not* accept a partial verdict.

The Court's analysis in *Hadnott*—set forth here with a few minor adaptations—addresses and rejects two arguments for why partial verdicts are impermissible in civil cases: The first argument is that partial verdicts are impermissible in civil cases because the Federal Rules of Civil Procedure are silent on the issue, whereas the Federal Rules of Criminal Procedure expressly provide for partial verdicts. *See* Fed. R. Crim. P. 31(b). But that inference-from-silence argument is not dispositive, especially because it relies on an assumption that the respective Rules' drafters and approvers (the respective Advisory Committees, the Judicial Conference, the Supreme Court, and ultimately Congress) have done a point-by-point comparison between the Civil and Criminal Rules and decided that what is expressly authorized in one setting is (by implication) prohibited in the

other setting. Indeed, the verdict rules themselves prove the point: the Civil Rules expressly provide for the possibility of special verdicts and general verdicts with special interrogatories, Fed. R. Civ. P. 49, but the Criminal Rules do not, Fed. R. Crim. P. 31 (aside from the setting of criminal forfeiture, Fed. R. Crim. P. 32.2(b)(5)(B)). Yet in federal criminal cases, special verdicts (or general verdicts with special interrogatories), although generally disfavored, are not categorically prohibited. *Black v. United States*, 561 U.S. 465, 472 n.11 (2010). Indeed, special verdicts are constitutionally *necessary* to find facts for mandatory-minimum and statutory-maximum purposes. *United States v. Claybrooks*, 729 F.3d 699, 708 (7th Cir. 2013). So the express provision in the Criminal Rules for partial verdicts does not take off the table the acceptance of partial verdicts in civil cases.

The second argument is that partial verdicts are impermissible in civil cases because the language of Federal Rule of Civil Procedure 54(b) demonstrates that partial verdicts are not acceptable in civil cases. Rule 54(b) pertains to the entry of judgment in cases with multiple parties and/or with more than one claim for relief. In these cases, a federal court may "direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). If a final judgment is not entered, the decision "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Id.* Because the Court has not entered a Rule 54(b) "final judgment," so the argument goes, the jury's verdicts are "revisable" until the entry of a judgment. But, a "judgment" does

not need to be a final, appealable judgment on all claims. The fact that Rule 54(b) permits a federal court to revise judgments before they become final does not necessarily cut against accepting the jury's partial verdict. Nothing in Rule 54(b) *requires* that a judgment be "revised," nor does it require that a judgment be entered when the Court—or a jury—disposes of one or more claims or terminates the action as to one or more parties. So the possibility of revision does not somehow bar the acceptance of verdicts on a subset of a case's claims.

Indeed, if anything, Rule 54(b) actually lends support to concluding that partial verdicts can be accepted in civil cases. Rule 54(b) "was adopted because of the potential scope and complexity of civil actions under the federal rules, given their extensive provisions for the liberal joinder of claims and parties." 10 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2654 (3d ed. 2011); *see also Exch. Nat'l Bank of Chi. v. Daniels*, 763 F.2d 286, 290-91 (7th Cir. 1985) (Rule 54(b) "is designed to alleviate a problem created by modern rules of pleading, which allow the joinder of multiple parties and claims."). Rule 54(b) recognizes that in multiple-party or multiple-claim civil cases, the circumstances might make it unfair to delay the end of a case for a subset of the parties or on a subset of all the claims. So for example here, it would be unfair to require Officer Garcia to retry the case when a jury returned unanimous verdicts for both claims brought against him. After the trial, the only undecided claim left was the excessive force claim against Officer Felix. As discussed further below, this claim is separable (both factually and legally) from the other claims and other parties, and could have been retried before

a second jury. (Remember, Sanchez has since settled his claim against Officer Felix.)

So *Hadnott* explains why federal courts as a legal matter can accept a partial verdict in civil cases. A brief look at the claims and the parties here, in turn, explains why the Court properly exercised its discretion to accept the partial verdict in *this* case: Sanchez's two claims against Officer Garcia and his one claim Officer Felix stem from two distinct incidents—one involving Sanchez's arrest on August 10, 2010 and the other involving the lunch-count dispute at Cook County jail on August 28, 2010. The facts underlying each incident had really no overlap. In fact, the case was only tried together by agreement of the parties and easily could have been severed. Under these circumstances, there really was no risk that there would be inconsistent verdicts if the Court accepted a partial verdict.[14] This textbook example of partial verdict appropriateness evidences that the Court acted well within its discretion when it accepted the partial verdict. As with all of Sanchez's other claims so far, this one is dismissed too.

### F. Cumulative Prejudicial Error

Sanchez asserts that cumulative error infected this case. New Trial Mot. at 9. "Where there are several errors, each of which is harmless in its own right, a new

---

[14]Sanchez maintains that "[i]n another civil district case, the court determined that a single jury should decide all claims and damage awards. *See, Sughayyer v. City of Chicago*, No. 09 C 4350 (N.D. Ill. 2012)."). New Trial Mot. at 9. It turns out that in *Sughayyer v. City of Chicago*, the district court refused to accept a partial verdict "[b]ecause of the *overlapping nature of the evidence and damages* related to the numerous claims … ." 2012 WL 2359065, at *3 n.3 (N.D. Ill. June 20, 2012) (emphasis added). The plaintiff in *Sughayyer* ultimately dismissed the deadlocked claims and the court accepted the jury's partial verdict. *Id.*

trial may still be granted if the cumulative effect of those otherwise harmless errors deprives a litigant of a fair trial." *Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013); *see also Christmas v. City of Chi.*, 682 F.3d 632, 643 (7th Cir. 2012). To establish cumulative error, Sanchez must show: "'(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered [their] trial fundamentally unfair.'" *Christmas*, 682 F.3d at 643 (quoting *United States v. Powell*, 6562 F.3d 702, 706 (7th Cir. 2011)). "In conducting this analysis, [courts] examin[e] ... the entire record, paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the trial court dealt with the errors, including the efficacy of any remedial measures; and the strength of the prosecution's case.'" *Christmas*, 682 F.3d at 643 (quoting *Powell*, 652 F.3d at 706).

Because all of Sanchez's other arguments have failed so far, this one must too. The Court has already scrutinized each decision challenged by Sanchez, including how those rulings played out at trial. None of those decisions were erroneous, which means that Sanchez's cumulative effect argument must be rejected as a matter of law. *See United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001) ("If there are no errors or a single error, there can be no cumulative error."). Because Sanchez has failed to show even a single error, his request for a new trial is denied.

Even assuming there were errors, Sanchez has still failed to show how the alleged errors reinforce or underpin one another. Nearly every alleged error that

Sanchez complains of concerned a discrete issue at trial. That is, Sanchez makes no effort to show how the "*interrelationship*, if any, and the[] *combined effect*" of the alleged errors deprived Sanchez of a fair trial. *Christmas*. 682 F.3d at 643 (emphases added) (quoting *Powell*, 652 F.3d at 706); *see also Jordan*, 712 F.3d at 1137 ("Where there are several errors, each of which is harmless in its own right, a new trial may still be granted if the cumulative effect of those otherwise harmless errors deprives a litigant of a fair trial."). The cumulative effect of the alleged errors that Sanchez complains of did not render his trial fundamentally unfair.

## G. Verdict Contrary to Clear Weight of Evidence

Finally, Sanchez argues that no rational jury could have rendered a verdict in favor of Officer Garcia. When determining whether the jury's verdict goes against the manifest weight of the evidence, courts consider "the general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia*, 650 F.3d at 633 (citation omitted). A verdict will only be set aside if "'no rational jury' could have rendered the verdict.'" *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (citing *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006)). What's more, "[j]ury verdicts deserve particular deference in cases with 'simple issues but highly disputed facts.'" *Moore*, 546 F.3d at 427 (quoting *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995)).

Here, Sanchez contends that the verdict was against the manifest weight of the evidence because "[Officer Garcia] was inherently unbelievable." New Trial Mot. at 9. Sanchez identifies eight "ways [Officer] Garcia was impeached," including:

1. Officer Garcia testified that he saw Sanchez's eyes and hands and looked inside of Sanchez's van during the traffic stop.

2. Officer Garcia at one point testified that he saw Sanchez's hands in the air and at another point testified that he saw Sanchez's hands at his side.

3. Officer Garcia testified that he never noticed Sanchez's stomach despite testifying that he saw Sanchez's eyes and hands.

4. Officer Garcia testified that he never noticed Sanchez's stomach despite testifying that he forced Sanchez to the ground.

5. Officers Garcia and Murphy gave varying testimony as to whether Sanchez was lying on his stomach while on the ground.

6. Officer Garcia testified that the marijuana was found on Sanchez during the arrest while other evidence showed it was found at the police station.

7. Officer Garcia testified at one point that he turned on his police lights just before Sanchez drove over a bridge and at another point testified that he turned on his lights after Sanchez drove through a second stop sign.

8. Office Garcia testified that Sanchez gave him "the finger," yet failed to include this information in the police report.

New Trial Mot. at 10. According to Sanchez, these discrepancies evidence that Officer Garcia "was unworthy of belief" and establish that "there was … no credible evidence to support the verdict in [Officer] Garcia's favor." *Id.*

The Court disagrees. At a minimum, the number and types of discrepancies Sanchez identifies here are no worse than those found in any other typical case. It is the very, very rare trial where one side's case is 100% consistent with all of the evidence, including its own evidence. And even where Sanchez manages to identify some actual inconsistency with Officer Garcia's testimony, the effect is not nearly as momentous as he makes it out to be. Most of these inconsistencies are minor details that are not so serious that Garcia's testimony would be rendered unbelievable.

The threadbare discrepancies Sanchez points out also pale in comparison to the amount of evidence presented at trial that *supported* the jury's verdict. The inconsistencies and patent fallacies woven throughout Sanchez's testimony are of note:

> 1. Sanchez testified that he only has seven to eight beers per day whereas a Cook County jail nursing record evidenced that Sanchez previously reported he had 18 beers per day. The medical evaluation taken a day after his arrest likewise evidenced that Sanchez previously reported he had 17 to 18 beers per day.

> 2. Sanchez testified at one point that he last drank two days before he was arrested, but testified at another point that he drank seven to eight beers the night before his arrest.

> 3. Sanchez testified that he gave Officer Garcia the peace sign, not "the finger."

> 4. Sanchez testified that he has at least seven beers per day (and two medical records evidenced that he had 17-18 beers per day), yet maintained that he just so happened to not have drank any beer the day of his arrest.

> 5. Sanchez maintained throughout trial that the officers planted an opened beer can in his car and marijuana in his pocket.

> 6. Sanchez testified that he experienced neck and shoulder pain from his arrest, but the hospital record from the night of his arrest made no mention of this pain.

This testimony not only reflects the credibility issues Sanchez had as a witness,[15] but also evidences the comparative strength of the facts favoring Officer Garcia's defense over Sanchez's case. *See Mejia*, 650 F.3d at 633. There was also other evidence, including Officer Murphy's testimony, Sanchez's medical records, and the

---

[15]Even if it came down to a straight credibility contest between Sanchez and Officer Garcia, that contest is best left for the jury to decide. *See Latino*, 58 F.3d at 317 ("[S]ince the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." (internal quotations and citation omitted)).

underlying D.U.I. conviction, which supported Garcia's version of events and the jury's verdict. Sanchez has failed to demonstrate any basis for the Court to veto the jury's verdict. Because the jury's finding was not against the manifest weight of the evidence, a new trial is not warranted.

### IV. Conclusion

For the reasons above, Sanchez's motion for a new trial, R. 271, is denied.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 15, 2016